UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                       :

In re:                          :

                                :      Chapter 15

THE INTERNATIONAL BANKING    :

CORPORATION B.S.C.,             :      Case No. 09-17318 (SMB)

                                :

            Debtor in a        :

            Foreign Proceeding.   :

                                :

------------------------------------------------------x

 

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN ORDER
PURSUANT TO 11 U.S.C. §§ 1507, 1521(a)(5) AND 1521(b) VACATING
CERTAIN ORDERS OF ATTACHMENT AND DIRECTING THE
TURNOVER OF CERTAIN ATTACHED FUNDS TO THE ADMINISTRATOR
FOR ADMINISTRATION IN THE FOREIGN MAIN PROCEEDING IN BAHRAIN**

HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone:  212-513-3200
Telefax:     212-385-9010

*Counsel for the Administrator of
The International Banking Corporation B.S.C.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

FACTS ........................................................................................................................... 2

    A.    TIBC AND THE UNITED STATES LITIGATION ................................................. 2

    B.    THE BAHRAINI JUDICIAL SYSTEM AND TIBC'S ADMINISTRATION ................ 5

    C.    THE DISSOLUTION OF PRE-JUDGMENT ATTACHMENTS UNDER BAHRAIN LAW ...................................................................................................................... 8

        1.    Protective and Interim Measures (Including Attachments) Under Bahraini Law ...................................................................................... 8

        2.    Dissolution of Bahraini Protective and Interim Measures ................ 10

        3.    Avoidance of Preferences under Bahraini Law ................................ 11

        4.    The Administration ........................................................................... 12

ARGUMENT ............................................................................................................... 12

PETITIONER IS ENTITLED TO A TURNOVER OF THE ATTACHED FUNDS PURSUANT TO 11 U.S.C. §§ 1507, 1521(A)(5) AND 1521(B) ............................... 12

    A.    THIS COURT HAS THE STATUTORY POWER TO VACATE THE ATTACHMENTS AND ORDER TURNOVER OF THE ATTACHED FUNDS TO THE ADMINISTRATOR ........ 13

    B.    INTERNATIONAL COMITY IS THE OVERRIDING FACTOR WITH RESPECT TO PETITIONER'S TURNOVER MOTION AND GOVERNS THIS COURT'S ANALYSIS ......... 14

    C.    PETITIONER IS ENTITLED TO TURNOVER OF THE ATTACHED FUNDS PURSUANT TO §§ 1521(A)(5) AND 1521(B) .................................................... 16

        1.    Just Treatment Will be Afforded to All Parties. ............................... 16

        2.    U.S. Claimholders Will Not Be Inconvenienced. ........................... 17

        3.    Turnover will Prevent, Not Cause, the Preferential or Fraudulent Disposition of TIBC's Property ....................................................... 18

        4.    Any Distribution Will  Substantially Accord with U.S. Law. .......... 18

    D.    ADDITIONAL ASSISTANCE UNDER § 1507 ALSO  SHOULD BE GRANTED HERE BASED ON BAHRAINI LAW .............................................................................. 23

        1.    The Law of the Foreign Insolvency Forum Provides a Basis For Turnover under § 1507 ..................................................................... 23

        2.    The Attachments Would Be Dissolved Under Bahraini Law. .......... 25

CONCLUSION ............................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.I. Trade Finance, Inc. v. Petra Bank,*
    No. 89 Civ. 7987, 1997 WL 291841 (S.D.N.Y. June 2, 1997)........................................22, 23

*Benoit v. Lund,*
    330 B.R. 105 (D. Vt. 2004)..............................................................................................15

*Canada So. Ry. Co. v. Gebhard,*
    109 U.S. 527 (1883)........................................................................................................17

*CSL Australia Pty. Ltd. v. Britannia Bulkers PLC,*
    No. 08 Civ. 8290, 2009 WL 2876250...........................................................................23, 25

*Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,*
    773 F.2d 452 (2d Cir. 1985)..........................................................................................15, 17

*Deutsche Bank AG v. The International Banking Corporation, BSC,*
    No. 601471/2009 (Fried, J.)...............................................................................................3

*In re Atlas Shipping A/S,*
    404 B.R. 726 (Bankr. S.D.N.Y. 2009) ........................................................................ passim

*In re Axona Intern. Credit & Commerce, Ltd.,*
    88 B.R. 597 (Bankr. S.D.N.Y. 1988), *aff'd,* 115 B.R. 442 (S.D.N.Y. 1990)..........................20

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd.,*
    374 B.R. 122 (Bankr. S.D.N.Y. 2007)..............................................................................15

*In re Board of Directors Compania General Combustibles, S.A.,*
    269 B.R. 104 (Bankr. S.D.N.Y. 2001)...........................................................................20, 21

*In re Condor Ins. Ltd.,*
    ___ F.3d ___, 2010 WL 961613 (5th Cir. Mar. 17, 2010)............................................2, 24, 25

*In re Culmer,*
    25 B.R. 621 (Bankr. S.D.N.Y. 1982) ........................................................................ passim

*In re Davis,*
    191 B.R. 577 (Bankr. S.D.N.Y. 1996)...............................................................................20

*In re DeLancey,*
    77 B.R. 424 (Bankr. S.D.N.Y. 1987)................................................................................22

*In re Kors, Inc.,*
    819 F.2d 19 (2d. Cir. 1987)...................................................................................22

*In re Metzeler,*
    78 B.R. 674 (Bankr. S.D.N.Y. 1987)...................................................................24

*In re Milovanovic,*
    357 B.R. 250 (Bankr. S.D.N.Y. 2006)................................................................17

*In re Rosacometta, S.r.l,*
    336 B.R. 557 (Bankr. S.D. Fla. 2005)..................................................................17

*In re Savidge,*
    57 B.R. 389 (D. Del. 1986)..................................................................................22

*In re Treco,*
    240 F.3d 148 (2d Cir. 2001)...........................................................................20, 21

*In re Velazquez,*
    397 B.R. 231 (Bankr. D.P.R. 2008).....................................................................15

*In re Wilkinson,*
    196 B.R. 311 (Bankr. E.D. Va. 1996)..................................................................15

*Israel British Bank (London), Ltd. v. Federal Deposit Insurance Corp.,*
    536 F.2d 509 (2d Cir.), *cert. denied sub nom. Bank of the Commonwealth v. Israel-*
    *British Bank (London) Ltd.,* 429 U.S. 978 (1976) ...............................................16

*Koehler v. Bank of Bermuda, Ltd.,*
    12 N.Y.3d 533, 911 N.E.2d 825 (2009)..............................................................22

*Mashreqbank PSC v. The International Banking Corporation, BSC,*
    No. 601616/2009 (Fried, J.)..................................................................................3

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,*
    825 F.2d 709 (2d. Cir. 1987)................................................................................14


**STATUTES**

11 U.S.C. § 101...........................................................................................................12

11 U.S.C. § 304.................................................................................................... passim

11 U.S.C. § 1501(a)(3)................................................................................................15

11 U.S.C. § 1507.................................................................................................. passim

iii

11 U.S.C. §1520 ..................................................................................................5

11 U.S.C. § 1521 .................................................................................16, 19, 23

11 U.S.C. § 1521(a) ...........................................................................................13

11 U.S.C. § 1521(a)(5) ...................................................................1, 12, 13, 26

11 U.S.C. §§ 1521(a)(7) ...................................................................................24

11 U.S.C. § 1521(b) ......................................................................1, 2, 12, 13, 26

11 U.S.C. § 1523(a) ...........................................................................................24

12 U.S.C. 1821(d)(13)(C) .................................................................................19

12 U.S.C. 1821(d)(13)(D) .................................................................................19

12 U.S.C. 1825(b)(2) .........................................................................................19

**OTHER AUTHORITIES**

Lowell, John, *Conflict of Laws as Applied to Assignments for Creditors*
1 Harv.L.Rev. 258 (1888) ...........................................................................14

Trowers & Hamlins, External Administrator and Foreign Representative ("Petitioner" or the "Administrator") of The International Banking Corporation, B.S.C.(c) ("TIBC"), respectfully submits this memorandum of law and the accompanying Declaration of Haya Rashed al Khalifa executed on May 3, 2010 ("Khalifa II"),[1] Declaration of Abdullah Mutawi executed on April 29, 2010 ("Mutawi II"),[2] and Affidavit of H Barry Vasios, Esq., sworn to May 3, 2010 ("Vasios Aff.") in support of its motion for an order pursuant to 11 U.S.C. §§ 1507, 1521(a)(5) and 1521(b) of the Bankruptcy Code vacating the Attachments (defined below) to the extent of directing that the $26,918,494.59 of TIBC's funds being held by the Sheriff of New York County[3] (the "Attached Funds") pursuant to such Attachments be turned over to the Administrator for administration in the Bahrain administration proceeding ("the Administration") conducted under the supervision of the Central Bank of Bahrain (the "CBB").

## PRELIMINARY STATEMENT

This Court should grant the relief requested. In cases brought under both chapter 15 of the Bankruptcy Code and former § 304, Bankruptcy Courts have routinely vacated pending pre-judgment attachments of an insolvent foreign debtor's assets in the United States and ordered that such assets be turned over to the foreign debtor's representative for administration in the foreign insolvency proceeding, in furtherance of the principles of international comity and so as to avoid piecemeal or preferential distribution of the estate's assets.

---

[1] Petitioner also relies upon the Declaration of Haya Rashed al Khalifa executed on December 12, 2009 (Docket No. 4), which was previously submitted in support of the chapter 15 Verified Petition ("Khalifa Declaration").

[2] Petitioner also relies upon the Declaration of Abdullah Mutawi executed on December 12, 2009 (Docket Nos. 3 and 8), which was previously submitted in support of the chapter 15 Verified Petition ("Mutawi Declaration").

[3] An additional $2,353,828.84, is held by HSBC Bank USA ("HSBC") in New York City subject to the Attachments and the conflicting claim of Bayerische Hypo-Und Vereins Bank AG ("HVB") that it is the owner of those funds as well as other TIBC funds subject to purported set-off by HSBC. The Administrator does not seek the return of those funds to Bahrain in this motion, as the ownership of those funds is a separate issue not before this Court on this motion, but reserves its right to do so in the future. Mutawi II at ¶7.

In this case, international comity, the guiding principal underlying chapter 15, mandates cooperation with the Administrator. The standard for relief under §1521(b), which requires that the interests of creditors in the United States be sufficiently protected, also is met. Likewise, the overlapping factors applicable to relief under §1507 - (1) just treatment of all holders of claims or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; and, (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by the Bankruptcy Code – also favor turnover of the funds at issue here.

Under the applicable Bahraini law, the Attachments are void as preferences and would be vacated upon application to a Bahraini court.[4] Thus, the interests of international comity underlying chapter 15 proceedings strongly support this Court's *vacatur* of the Attachments and turnover of the attached funds to the Administrator for deposition in the Administration.

## FACTS

**A.    TIBC and the United States Litigation**

TIBC is a banking entity formed in 2002 under the laws of the Kingdom of Bahrain as a Bahrain Shareholding Company (Closed)[5] and is licensed and regulated as a wholesale bank by the Central Bank of Bahrain ("CBB ") pursuant to the Central Bank of Bahrain and Financial Institutions Law 2006 ("BCBL"). TIBC began operating during the second quarter of 2003 and

---

[4] Recent authority makes clear that a Bankruptcy Court can apply the law of the jurisdiction where the main insolvency proceeding is pending to disputes arising in a chapter 15 case. *See In re Condor Ins. Ltd.*, ___ F.3d ___, 2010 WL 961613, at *6-7 (5th Cir. Mar. 17, 2010).

[5] A private company consisting of no less than two shareholders who subscribe to shares not offered to the public.

carried out "Regulated Services" as that term is defined in the BCBL.[6] TIBC has at all times maintained its principal place of business at 3rd Floor, The Bahrain Commercial Complex, Government Avenue, Manama, Kingdom of Bahrain. TIBC has never maintained any offices, employees or agents in New York. Mutawi II at ¶¶ 2-4. Before it was placed in administration, TIBC conducted numerous foreign trading and investment transactions denominated in U.S. Dollars from its offices in Bahrain. To that end, TIBC maintained a number of bank accounts with correspondent banks in New York pursuant to standard U.S. Dollar currency exchange trading practices. Mutawi Declaration at ¶¶ 10-11.

A combination of the world-wide recession and a number of financial irregularities created a severe liquidity crisis at TIBC, which, by May 9, 2009, rendered it unable to pay its debts and obligations. On May 13, 2009, Deutsche Bank AG ("Deutsche Bank"), a German bank, commenced an action styled *Deutsche Bank AG v. The International Banking Corporation, BSC,* No. 601471/2009 (Fried, J.), against TIBC in the Supreme Court, New York County for sums allegedly due to it in connection with certain foreign exchange transactions ("FX Transactions").[7] Deutsche Bank simultaneously moved for an *ex parte* temporary restraining order (the "Restraining Order") and order of attachment with respect to TIBC's property located in New York. Mutawi II at ¶ 5. A copy of the order of attachment obtained by Deutsche Bank is attached as Exhibit 1 to the Vasios Aff.

On May 22, 2009, Mashreqbank PSC ("Mashreqbank"), a bank incorporated in the United Arab Emirates, commenced a similar action styled *Mashreqbank PSC v. The International Banking Corporation, BSC,* No. 601616/2009 (Fried, J.) against TIBC in the

---

[6] A copy of relevant portions of the English language version of the BCBL is attached as Exhibit A to the Khalifa Declaration.
[7] An FX Transaction is a currency swap agreement whereby the parties agree to exchange funds in an agreed amount in agreed currencies.

Supreme Court, New York County to recover amounts allegedly due to it in connection with a purported FX Transaction. Mashreqbank sought and obtained an order of attachment with respect to TIBC's property located in New York. A copy of the order of attachment obtained by Mashreqbank is attached as Exhibit 2 to the Vasios Aff. Mashreqbank's order of attachment together with the Deutsche Bank attachment order are referred to as the "Attachment Orders." *Id.* at ¶ 6.

The FX Transactions between Deutsche Bank and TIBC were governed by an ISDA Master Agreement (the "Master Agreement") and related Credit Support Annex, each dated January 10, 2007 (the "DB Agreements"). The DB Agreements were not negotiated or signed in the US; they are governed by English law. The specific terms of the FX Transactions at issue in the Deutsche Bank action were negotiated and agreed to by TIBC employees in Bahrain and Deutsche Bank employees in London. In the FX Transactions with Deutsche Bank, TIBC was to deliver British Pounds to Deutsche Bank in London. *Id.* at ¶ 8.

The purported FX Transaction and agreement at issue in the Mashreqbank action were negotiated and agreed to by TIBC employees in Bahrain and Mashreqbank employees in Dubai, United Arab Emirates. The alleged FX Transaction contemplated that TIBC would deliver Saudi Riyals to a Mashreqbank account in Saudi Arabia. *Id.* at ¶ 9.

After TIBC's New York correspondent banks were served with the Attachment Orders, a number of those banks delivered TIBC's account balances to the custody of the New York County Sheriff. In total, $29,271,938 of TIBC's funds are being held in New York under the Attachment Orders. Of this amount, $26,918,494.59 is being held by the New York County Sherriff (the "Attached Funds") and $2,353,828.84 is being held by HSBC Bank USA. *Id.* at ¶ 7.

As noted above in fn.3, TIBC's ownership of the $2,353,828.84 is disputed by HVB, a German bank which claims it owns those funds.

On July 30, 2009, the CBB placed TIBC in administration. On August 6, 2009, the CBB appointed the Petitioner as the External Administrator of TIBC. *Id.* at ¶ 10. The External Administrator supervises the affairs of the licensee and has "all the powers necessary for the management and running of the business of the Licensee." *See* Khalifa Declaration ¶ 11; Mutawi Declaration ¶¶ 30-31. To that end, the Administrator had requested that all creditors of TIBC submit a notice detailing the amounts due and basis for any claims against TIBC. Deutsche Bank submitted a notice of claim ("the Claim") dated August 28, 2009, and Mashreqbank submitted a notice of claim dated August 30, 2009, for the amounts owed in relation to the Foreign Exchange Transactions. Mutawi Declaration at ¶ 43 and Exhibits D and E. Each of the notices of claim specifically reference the amounts at issue in the New York actions and describe the New York attachments.

On December 14, 2009, the Administrator commenced this chapter 15 case. On January 15, 2010, this Court entered an order (the "Recognition Order") (Docket No. 24) recognizing (a) the Administration as a "foreign main proceeding," (b) Petitioner as the foreign representative, and (c) granting Petitioner all relief provided pursuant to 11 U.S.C. §1520 without limitation. The Recognition Order provides that the Attached Funds and the Attachment Orders would remain in place pending the further order of this Court.

B. **The Bahraini Judicial System and TIBC's Administration**

As set forth in the 2002 constitution of Bahrain, the Bahraini judiciary is an independent and separate branch of the government. There are two parallel court systems, the civil and

Sharia[8] courts. The civil courts consist of summary courts, appeal courts, and courts of cassation. The jurisdiction of the civil courts include commercial, administrative and criminal matters as well as insolvency proceedings and the execution of judgments. Summary courts, appeal courts and courts of cassation are located in Manama, the capital of Bahrain. The appeal courts hear appeals from the summary courts and the court of cassation is the highest appellate court in Bahrain. Khalifa II at ¶¶ 7-9.

Bahrain law is based on the civil law systems of Egypt and France. However, Bahraini legal principles were developed with the assistance of British legal advisors beginning in the 1920s, and this continued until Bahrain's independence in 1971. Post-1971 Bahrain law still relies on some aspects of British law, especially with respect to banking matters such as those at issue here. *Id.* at ¶ 10.

Bahraini civil courts are routinely involved in cases where individuals or entities who are foreign appear as litigants. Additionally, access to the Bahraini courts is open to all and all litigants are treated justly and fairly. Khalifa II at ¶ 11; Mutawi II at ¶ 14.

In recent years Bahrain has made a concentrated effort to be recognized as a leading international financial center. As stated in Article 3(4) of the BCBL, one of the objectives of the CBB is to "protect the interests of depositors and the customers of the financial institutions and enhance the Kingdom's credibility as an international financial centre." Khalifa II at ¶ 12; Mutawi II at ¶ 15.

Many of the financial transactions which take place in Bahrain are international in character, and there is no distinction between domestic and foreign creditors in Bahraini insolvency proceedings; all creditors of a similar priority are treated similarly. Khalifa II at ¶ 13;

---

[8] Sharia courts deal with personal status issues, e.g., marriage, divorce and inheritance. There are Sharia courts of the first instance and a Sharia court of appeal. *See* Khalifa II at ¶ 8.

Mutawi at ¶¶ 13-14. Similarly, where the law accords a creditor a privilege such as a security interest or lien in a debtor's property that privilege will be respected in accordance with the law regardless of whether that creditor is foreign or domestic. Khalifa II at ¶ 13.

Like Deutsche Bank and Mashreqbank, the majority of TIBC's creditors are not Bahraini entities or individuals. Mutawi II at ¶ 13. All foreign parties involved in TIBC's administration will be treated equitably and fairly by the Bahraini courts, the Administration, and any further insolvency proceedings irrespective of their nationality. Khalifa II at ¶ 15. Deutsche Bank and Mashreqbank regularly do business in Bahrain and have submitted claims in the TIBC Administration in Bahrain. *Id.* at ¶ 16; Mutawi II at ¶ 16.

Based upon the organization and requirements of the BCBL, the Administrator functions as the appointee of the CBB and is directly responsible to it. That statutory framework and supervision precludes the possibility of preferential or fraudulent disposition of TIBC's property. Khalifa II at ¶ 17. Moreover, the duties of the Administrator are separate from those of the liquidator (*see* Article 145 of BCBL). The actual distribution of TIBC's assets will be done by a court-appointed liquidator supervised by the CBB and the court, and the liquidator may only make distributions with the approval of the court. *Id.*

To ensure equitable treatment of all creditors who are competing for a licensee's assets, Part 10 of the BCBL empowers and commands the Administrator to collect all assets of TIBC, wherever located, and to determine all liabilities. The TIBC Administration thus encompasses all assets and liabilities of TIBC world-wide. Likewise, all creditors of TIBC, foreign or domestic, are entitled to file their claims in the Administration proceeding. The aim of this part of the BCBL is to grant the Administrator full powers to treat all creditors fairly and comprehensively. Khalifa Declaration at ¶ 19.

Any distribution to TIBC's creditors in the liquidation proceeding will be made in accordance with the priorities set forth in Article 156 of the BCBL. Khalifa II at ¶ 18. The basic priority order for the distribution mandated by Article 156(a) of the BCBL is:

(1) Administrator's fees and reasonable expenses, and wages and salaries of employees of the licensee until the petition for liquidation was filed;

(2) Liquidator's fees and reasonable expenses;

(3) fees and taxes due to the government;

(4) deposits and loans taken with the approval of the CBB to protect the licensee from insolvency;

(5) deposits of value not exceeding 20,000 Bahraini dinars per depositor and all other unsecured debts; and,

(6) amounts due to shareholders in proportion to their respective shares.

*Id.*

Article 156(c) of the BCBL directs that claims which are recognized as "secured debts" have priority over all other claims with respect to the collateral that secures such claims:

The secured debts of the creditors of the Licensee and the current settlements taking place in the clearing house of the stock exchange should be paid without reference to the order of priority set in paragraph (a) of this Article.

Based upon this provision of the BCBL, where a "secured debt" exists it has priority in the relevant collateral even over the fees and expenses of the Administrator and Liquidator. *Id.* at ¶¶ 19-20.

**C.  The Dissolution of Pre-Judgment Attachments Under Bahrain Law**

*1.  Protective and Interim Measures (Including Attachments) Under Bahraini Law*

The Bahrain Civil and Commercial Procedures Law, 1971 ("CCPL") governs protective and interim measures - including the equivalent of "attachments" under Bahraini law. Chapter 4, Article 176 of the CCPL addresses the interim measures which may be issued pre-judgment - that is, until a judgment is issued either confirming or rejecting the claim:

The Court may on application of the plaintiff order all or some of the defendant's property to be placed under precautionary sequestration if the plaintiff has serious grounds for fearing that the defendant will abscond or smuggle his property abroad or dispose of it with the intention of obstructing or delaying any order or decision issued against him.

Thus, interim measures - including precautionary sequestration of a defendant's property may be entered by a Bahrain Court if there are serious grounds which lead the plaintiff to fear that the defendant will abscond or smuggle[9] his property in order to prevent the plaintiff from executing on a future judgment.[10] Khalifa II ¶¶ 21-24.

There is no interim device under Bahraini law that permits a creditor to gain priority over other creditors prior to judgment. Specifically, the Bahrain law's equivalent of a New York "attachment" is a protective order that continues until a final judgment is issued or the order is overturned upon the defendant's objection. The attachment or interim measure granted to the applicant is a freeze over the defendant's accounts or property during the litigation. After the final judgment and subject to the rights of prior secured creditors in the same property, the attached property will be allocated in an execution proceeding to pay the judgment amount and then the remaining property will be for the creditors. See id. at ¶ 26.

In Bahrain, there are two phases of litigation: first, the adjudication of the dispute (the "Adjudication Period"); and second, if a judgment is obtained, the execution of the judgment. The Bahrain attachment device does not provide the attaching creditor with priority over other creditors during the Adjudication Period (i.e., prior to judgment). Thus, even if an attachment

---

[9] In the context of this Article, "smuggle" means to transfer, hide or sell assets in an attempt to prevent execution against such property. Khalifa II at ¶ 23.

[10] For instance, in case number 165 of 1995, the Bahraini Court of Cassation held that: "The events on which the legislator allows the court to decide by applying Article 176 of the Civil and Commercial Procedure Law to place an interim measure on the defendant's property is based on the element of fear that the creditor may lose the guarantee to receive his rights ..." Khalifa II at ¶ 24.

has been obtained, if there is no final judgment, the previously-attached funds will be available to other creditors and no priority is afforded to the plaintiff.[11] *Id.*

2.    *Dissolution of Bahraini Protective and Interim Measures*

The Administrator may apply to the court in Bahrain or to a foreign court to remove an attachment if the Administrator finds that such action will serve the benefit of other creditors or the continuation of the attachment will harm creditors' rights. *Id.* at ¶ 27. The Administrator may base its application to remove the attachment on several grounds including:

(a) its preference avoidance powers under the BCBL;

(b) the principal that all creditors must be treated equally during the administration or the liquidation;

(c) the attachment is harming the interest of TIBC, other creditors and/or the customers of TIBC;

(d) the power of the Administrator to "suspend or limit the discharge of financial obligations of the licensee" pursuant to Article 140(a)(2) of the BCBL; and

(e) that the element of fear, required by Article 176 of the CCPL as justification for the attachment, is no longer present.

*Id.* at ¶ 28.

Here, a Bahraini court likely would grant an application to vacate the pre-judgment attachments at issue here, on any or all of the following grounds:

(i)    the attachments result in a preference, and the Administrator is obligated to treat similarly situated creditors equally;

(ii)   the pre-judgment attachments have not been reduced to a judgment, so the funds are available for all creditors; and

(iii)  the existence of the Administration negates the element of fear required to maintain a pre-judgment attachment.

---

[11] By contrast, once a judgment *is* issued in favor of the attaching creditor, the attachment will provide the creditor a priority over other creditors who obtain later judgments against the defendant. Such post-judgment priority is not superior to the rights of creditors who have a prior mortgage or privilege by law (*i.e.*, such as the rights of the employees of the defendant), with respect to the relevant property. *Id.*

*Id.* at ¶ 29. Thus, maintaining the Attachments will harm the creditors and will prevent the Administrator from performing its obligations. *Id.*

3.    *Avoidance of Preferences under Bahraini Law*

It is likely that a Bahraini Court would find the Attachments in this case to be a preference and dissolve them as well. *Id.* at ¶ 35. Article 140 of the BCBL grants the Administrator wide powers to manage and run the business of the licensee under administration and to gather assets of the licensee for ultimate distribution to its creditors. The article explicitly provides in paragraph (b)(6) that the Administrator shall: "Undertake any necessary actions in the interest of the Licensee and for the protection of the interests of its customers and creditors." Hence, the Administrator has discretion to take any action to protect the licensee's, customers' and creditors' interests, including seeking to vacate an attachment that creates a preference or otherwise benefits one creditor over other similarly situated creditors. *Id.* at ¶¶ 30-31.

Article 158(a) of the BCBL sets out certain transactions that are void as preferential or fraudulent including:

(a) concluding any transaction at an undervalue with any person;

(b) entering into a transaction for the purpose of defrauding any creditor; and

(c) giving a preference to any person.

Article 158(b) of the BCBL sets the "Prohibition Period" for these void transactions at six months prior to the date of the Administration or two years prior to any liquidation. *Id.* at ¶ 33-34.

The Administrator may invoke the six-month prohibition period as the basis of a request to dissolve an order (such as an attachment order) obtained against TIBC during that period under Bahrain law. *Id.* at ¶ 36. The Attachments occurred well within the statutory six-month

prohibition period. Accordingly, they would likely be deemed preferential by a Bahrain court. *See id.* at ¶ 35.

### 4. The Administration

Since the inception of the Administration, the Administrator, under the supervision of the CBB, has been diligent in collating the claims of TIBC's creditors as well as assessing and analyzing TIBC's financial state. Mutawi II at ¶¶ 11, 15.

Indeed, the Administration has learned that among its assets, TIBC is owed approximately $3.2 billion related to third-parties' defaults in various obligations the recovery of which the Administrator intends to pursue. Mutawi II at ¶12.

Moreover, it is also relevant to note that the CBB strongly supports the Administrator in this motion. Mutawi II at ¶ 19.

Given the progress of the Administration, it only makes sense that the Attached Funds should be turned over expeditiously to the Administrator.

## ARGUMENT

### PETITIONER IS ENTITLED TO A TURNOVER OF THE ATTACHED FUNDS PURSUANT TO 11 U.S.C. §§ 1507, 1521(a)(5) and 1521(b)

The Attached Funds are part of TIBC's estate and should be turned over to the Administrator for disposition in the insolvency proceedings in Bahrain. This Court has already recognized the Administration as a foreign main proceeding pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, ("chapter 15") and in doing so, has held that the Administration meets all the requirements for such recognition as set forth in chapter 15. The turnover of the attached funds requires that the Attachment Orders issued by the New York County Supreme Court in the Deutsche Bank and Mashreqbank actions be dissolved to the extent those orders restrain the "Attached Funds". This dissolution is not requested pursuant to the

"avoidance" provisions of the United States Bankruptcy Code, but rather under 11 U.S.C. §§ 1521(a) and (b), 11 U.S.C. § 1507, the principles of international comity and the provisions of Bahraini law governing the Administration of insolvent Bahraini banks.

## A. This Court Has the Statutory Power to Vacate the Attachments and Order Turnover of the Attached Funds to the Administrator

11 U.S.C. § 1521(a)(5) permits this Court to entrust the administration or realization of all or part of TIBC's assets within the United States to the foreign representative.[12] 11 U.S.C. § 1521(b) provides for the extra-territorial turnover of TIBC's assets in the United States to the foreign representative in Bahrain so long as United States creditors are sufficiently protected.[13] Moreover, 11 U.S.C. § 1507 permits this Court to provide "additional assistance" to Petitioner with the same, explicit, caveat.[14] Thus, a clear statutory basis exists for this Court to grant the requested turnover relief.

Moreover, as held in *In re Atlas Shipping A/S*, 404 B.R. 726, 740-42 (Bankr. S.D.N.Y. 2009), §§ 1521(a)(5) and 1521(b) are sufficient statutory bases to use to vacate attachments of an

---

[12] 11 U.S.C. § 1521(a) provides in pertinent part as follows: "Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief including…. (5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative…."

[13] 11 U.S.C. § 1521(b) provides in pertinent part as follows: "Upon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative…provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected."

[14] 11 U.S.C. § 1507 provides: "(a) Subject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States. (b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such assistance, consistent with the principles of comity, will reasonably assure – (1) just treatment of all holders of claims against interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns."

insolvent foreign debtor's assets located in the U.S., entrust those assets to the foreign representative and permit that representative to turn them over to the jurisdiction and administration of a foreign insolvency proceeding previously recognized under chapter 15.

## B. International Comity is the Overriding Factor with Respect to Petitioner's Turnover Motion and Governs this Court's Analysis

By recognizing the Administration under chapter 15, this Court has granted comity to the Bahrain proceeding. The principle of comity dictates that the Attached Funds <u>should</u> be turned over to the Administrator in Bahrain regardless of whether the attachments would be upheld under Bahraini law, unless this Court finds that Bahraini law or the Administration violates a fundamental public policy of the United States.

The principles underlying international comity in the context of cross-border insolvencies have remained largely unchanged for more than a century. For example, in 1982, Judge Lifland relied heavily on the following passage from an 1888 Harvard Law Review article to support his decision to dissolve New York creditors' various interim remedies – including attachments - and direct turnover of the foreign debtor's assets to a Bahamian liquidation proceeding:

> 'It is obvious that, in the present state of commerce and of communication, it would be better in nine cases out of ten that all settlements of insolvent debtors with their creditors should be made in a single place, better for the creditors, who would thus share alike and better for the debtor because all his creditors would be equally bound by his discharge.' Lowell, John, *Conflict of Laws as Applied to Assignments for Creditors,* 1 Harv.L.Rev. 258, 264 (1888).

*See In re Culmer*, 25 B.R. 621, 633 (Bankr. S.D.N.Y. 1982).

"Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d. Cir. 1987) (citations omitted). If the attached funds are turned over to the Administrator for administration in Bahrain, this will not prejudice any creditor's rights to assert their claims in the

Bahrain proceeding (and in fact, both Deutsche Bank and Mashreqbank have already done so). By contrast, to allow Deutsche Bank and Mashreqbank to successfully "preclude the relief requested would grant them preferences to which they are not entitled" under Bahraini law. *See Culmer*, 25 B.R. at 629 (further observing that bankruptcy courts are "not obliged to protect the positions of fast-moving American and foreign attachment creditors over the policy favoring uniform administration in a foreign court") (citing *Banque de Financement, S.A. v. First National Bank of Boston*, 568 F.2d 911, 921 (2d Cir. 1977)).

The overriding philosophy of chapter 15, as well as its predecessor, former § 304, is deference to foreign insolvency proceedings and the avoidance of the piecemeal distribution of the debtor's estate. *See, e.g., Atlas*, 404 B.R. at 738; *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 455 (2d Cir. 1985). Unlike § 304 however, and "[u]nique to the Bankruptcy Code," chapter 15 contains a statement of purpose: "'to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency.'" *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd.*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007) (quoting 11 U.S.C. § 1501), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008). Among the express objectives of chapter 15 is to promote the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor . . ." 11 U.S.C. § 1501(a)(3).

Neither Bahraini law nor the Administration violate the fundamental public policy of the United States. Indeed, under the United States Bankruptcy Code, the Attachments in this case would be subject to avoidance because they occurred within 90 days of TIBC's placement into Administration. *See Benoit v. Lund*, 330 B.R. 105 (D. Vt. 2004); *In re Velazquez*, 397 B.R. 231 (Bankr. D.P.R. 2008); *Cf. In re Wilkinson*, 196 B.R. 311, 322-23 (Bankr. E.D. Va. 1996).

Further, the Second Circuit has expressly held, "[t]he theme of the Bankruptcy Act is equality of distribution of assets among creditors, ... and correlatively avoidance of preference to some. ... The road to equity is not a race course for the swiftest." *Israel British Bank (London), Ltd. v. Federal Deposit Insurance Corp.,* 536 F.2d 509, 513 (2d Cir.), *cert. denied sub nom. Bank of the Commonwealth v. Israel-British Bank (London) Ltd.,* 429 U.S. 978 (1976).

Thus, the motion herein fully comports with the norms of international comity and the precepts underlying chapter 15.

## C.    Petitioner is Entitled to Turnover of the Attached Funds Pursuant to §§ 1521(a)(5) and 1521(b)

Once recognition is granted, relief under **§§** 1521(a)(5) and 1521(b) requires that the Court be satisfied that the interests of creditors in the United States are sufficiently protected. As in *Atlas*, this standard is easily met because there are no U.S. based creditors with an interest in the Attached Funds. *See Atlas*, 404 B.R. at 741.

To the extent applicable to the §1521 analysis, the additional factors set forth in § 1507 - (1) just treatment of all holders of claims against interests in the debtor's property; (2) protection of claimholders in the United States against the prejudice and inconvenience in the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; and (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by the United States Bankruptcy Code - also are met here.

### 1.    *Just Treatment Will be Afforded to All Parties.*

Bahrain is a sophisticated hub of commercial and international finance activity with a commercial legal dispute system substantially based upon French and British law.    The provisions of the BCBL, which govern the insolvency of Bahrain's banks, are comprehensive and equitable.  Further, as the Khalifa II and Mutawi II Declarations make clear, Bahrain's courts and

16

the Administration proceedings are open and fair: no party will be prejudiced by the fact that it is foreign-based. U.S. courts have found that foreign insolvency regimes ranging from Serbian (*see In re Milovanovic,* 357 B.R. 250 (Bankr. S.D.N.Y. 2006)), to Italian (*In re Rosacometta, S.r.l,* 336 B.R. 557 (Bankr. S.D. Fla. 2005)) to Swedish (*Cunard*) and Bahamian (*Culmer*) would provide just treatment to creditors sufficient to merit a turnover order such as that requested here. Thus, the first factor clearly weighs in Petitioner's favor.

     2.     *U.S. Claimholders Will Not Be Inconvenienced.*

     As an initial matter, neither Deutsche Bank (a German bank) nor Mashreqbank (a U.A.E. bank) are domestic U.S. creditors.

     Nor can they plausibly claim that they will be inconvenienced by submitting their claims in the Bahrain Administration – they have already done so. Moreover, both Deutsche Bank and Mashreqbank, sophisticated financial entities, knowingly negotiated the FX Transactions at issue with TIBC, a Bahrain Bank, through personnel located in TIBC's Bahrain office. *See Culmer*, 25 B.R. at 632 ("This result [turnover] is altogether just and appropriate as these creditors dealt freely with [the foreign debtor] and were undoubtedly aware that they were dealing with a bank incorporated under and subject to foreign law when they first began doing business with [the foreign debtor]"). In so holding, Judge Lifland quoted at length from the Supreme Court's "declaration" in *Canada So. Ry. Co. v. Gebhard,* 109 U.S. 527, 537-38 (1883):

> [E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance of that policy, which binds those in like situation with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him. He is conclusively presumed to have contracted with a view to such laws of that government, because the corporation must of necessity be controlled

by them, and it has no power to contract with a view to any other laws with which they are not in entire harmony.

*Culmer*, 25 B.R. at 632.

3. *Turnover will Prevent, Not Cause, the Preferential or Fraudulent Disposition of TIBC's Property.*

Directing the turnover of the Attached Funds for administration in the Bahrain insolvency proceedings is the only way to ensure that neither Deutsche Bank nor Mashreqbank will gain an unfair advantage or improper preference over similarly situated creditors under Bahraini law, which does not accord special status to attachments prior to judgment, or which fall within the six-month voidable preference period.

Moreover, any distribution of TIBC's estate in Bahrain ultimately will be performed by the liquidator to be appointed by the CBB under the supervision of the Bahraini court. Any of TIBC's creditors will have the opportunity to be heard and object to the treatment of their claim. The open nature of the proceedings, the direct supervision of any distribution by both the CBB and the Bahraini courts, and the comprehensive priority provisions of the BCBL are designed to eliminate the preferential or fraudulent disposition of TIBC's property. Indeed, the CBB has been actively supervising the Petitioner's activities with respect to TIBC's Administration, has been fully apprised of (and strongly supports) the instant motion, and will continue to closely monitor the Administrator's ongoing efforts. *See* Mutawi II at ¶¶ 15 and 19.

4. *Any Distribution Will Substantially Accord with U.S. Law.*

Turnover relief virtually identical to that sought by Petitioner was granted by Judge Glenn in *Atlas,* in connection with a chapter 15 filing, and by Judge Lifland in the context of a § 304 filing in *Culmer*. These cases demonstrate that turnover of attached assets is not precluded because a foreign insolvency regime does not accord priority status to pre-judgment attaching

creditors. It is only when the foreign insolvency regime provisions violate "fundamental" policies of the United States that this factor weighs against turnover.

Here, the extent to which United States Bankruptcy law protects New York state law prejudgment attaching creditors is not even clear, let alone "fundamental." Moreover, the attachments at issue, effectuated within 90 days of TIBC's insolvency proceedings, would constitute a voidable preference under the United States Bankruptcy Code.[15]

In *Atlas* Judge Glenn vacated a number of pre-judgment maritime attachments that were obtained both before and after the Danish debtor was placed into bankruptcy in Denmark. He also ordered that the attached funds be turned over to the Danish trustee on the basis of international comity and 11 U.S.C. § 1521. Danish bankruptcy law mandated that all pre- and post-judgment attachments be dissolved. Thus, notwithstanding the fact that under Danish law, the attaching creditors would almost certainly lose any priority afforded by virtue of the attachments pursuant to United States federal maritime law, the Court nevertheless directed turnover.

Similarly, in *Culmer*, where a handful of creditors purported to obtain preferences in the Southern District of New York, but Bahamian law would not recognize those preferences, Judge Lifland ordered turnover of the debtor's assets to the Bahamian liquidation proceeding, holding that a bankruptcy court "is not obliged to protect the positions of fast-moving American and foreign attachment creditors over the policy favoring uniform administration in a foreign court." 25 B.R. at 629.

---

[15] If TIBC were a United States bank in receivership, the U.S. Bankruptcy Code would not be controlling law. Instead, the applicable statutes would be those relating to the powers of the Federal Deposit Insurance Corporation as receiver, which are analogous to the provisions of the BCBL. Under 12 U.S.C. 1821(d)(13)(C) and (D) and 12 U.S.C. 1825(b)(2), the FDIC would generally be entitled to assert immunity to attachment or execution upon any formerly bank-owned assets in the possession of the receiver, and no property held by the FDIC as receiver would be subject to levy, attachment, garnishment, foreclosure, or sale without the consent of the receiver.

It is well established that the priority rules of a foreign jurisdiction need not be identical to those of the United States. *See, e.g., In re Board of Directors Compania General Combustibles, S.A.,* 269 B.R. 104, 112 (Bankr. S.D.N.Y. 2001) (where Judge Lifland dissolved a Texas preliminary injunction and held that comity should be granted to Argentinean proceedings notwithstanding the fact that Argentinean insolvency law, unlike the U.S. Bankruptcy Code, did not accord special status to swap agreements and noted that to hold otherwise "would effectively end cooperation among countries because special interest priority schemes vary greatly around the world").[16] Bahrain also does not provide special protections for swap participants, but as *Combustibles* makes clear, that fact does not preclude turnover.

According to Judge Lifland, "courts in New York have even more narrowly construed the exceptions to the comity doctrine, declaring: '[f]oreign based rights should be enforced unless the judicial enforcement of such a [right] would be the approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense.'" *Culmer,* 25 B.R. at 629 (citing *Intercontinental Hotels Corp. v. Golden,* 15 N.Y.2d 9, 13, 254 N.Y.S.2d 527, 529 (1964) and *Loucks v. Standard Oil Co.,* 224 N.Y. 99, 111, 120 N.E. 198, 202 (1918)).

Petitioner respectfully submits that no provision of the BCBL or any aspect of the Administration or possible liquidation of TIBC is "inherently vicious, immoral or shocking to the prevailing moral sense." By contrast, the facts in the Second Circuit's decision *In re Treco,* 240 F.3d 148 (2d Cir. 2001), where a turnover petition under 11 U.S.C. § 304 was denied, illustrate a circumstance that <u>was</u> shocking to the prevailing moral sense: "the *Treco* decision was based on an egregious set of facts involving what could be characterized as substantial maladministration by foreign liquidators of a foreign proceeding." *Combustibles,* 269 B.R. 109-110.

---

[16] *See also, In re Davis,* 191 B.R. 577, 587 (Bankr. S.D.N.Y. 1996) ("[i]n determining whether to accord comity to a foreign bankruptcy case, we need not find that the foreign law is identical to our own") and *In re Axona Intern. Credit & Commerce, Ltd.,* 88 B.R. 597, 610 (Bankr. S.D.N.Y. 1988), *aff'd,* 115 B.R. 442 (S.D.N.Y. 1990).

In *Treco*, United States creditors, arguably "secured" by virtue of their pre-insolvency contractual set-off rights, were prejudiced because under Bahamian law (and unlike the United States Bankruptcy Code and the BCBL) secured claims were subordinate to administrative expenses. 240 F.3d at 155. Moreover, and importantly, while the Bahamian liquidator collected approximately $10 million in receivables, only $1.75 million remained in the estate as a result of liquidators' fees running at a premium of 50% above their usual rates. In the meantime, the Bahamian liquidator had resolved only 30% of the outstanding claims against the estate. *Id.* at 159.

Accordingly, the United States set-off creditors would have been virtually wiped-out - not as a result of the differing Bahamas insolvency regime (which had been previously held sufficient to merit a turnover under 11 U.S.C. § 304) but due to outrageous and excessive fees charged by the foreign debtor's liquidator that had a higher priority than secured party interests. Here, there is and can be no such claim of gross maladministration of the Bahrain Administration.

Moreover, assuming, *arguendo*, that Deutsche Bank and Mashreqbank are "secured creditors," under U.S. law, it does not follow that they deserve any special priority in the context of a foreign insolvency. In *Combustibles*, Judge Lifland held that a broad reading of *Treco* – which would give heightened status to all secured creditors – is both unwarranted and impractical: "[s]ection 304 gives no indication that secured creditors are exempt from its operation, and such a rule might... excuse secured parties from participating in a foreign bankruptcy proceeding..." *Combustibles,* 269 B.R. at 111, n.8.

Under the Bankruptcy Code, property rights (such as "secured" status) are determined with reference to state law. *See, e.g., In re Kors, Inc.,* 819 F.2d 19, 22-23 (2d. Cir. 1987). New York law applies to Deutsche Bank and Mashreqbank's prejudgment attachments here.

It is not clear, under New York law, that creditors with an otherwise-valid prejudgment attachment enjoy secured status. In *Koehler v. Bank of Bermuda, Ltd.,* 12 N.Y.3d 533, 911 N.E.2d 825 (2009) the New York Court of Appeals stated: "Attachment simply keeps the debtor away from his property or, at least, the free use thereof; it does not transfer property to the creditor." 12 N.Y.3d at 538, 911 N.E.2d at 828.

In *In re Savidge,* 57 B.R. 389 (D. Del. 1986), the court held (under Delaware law) that prejudgment attachments are a "type of unperfected lien, created by [the plaintiff]'s writ of domestic attachment in order to compel the appearance of the defendant and wholly dependent upon the subsequent recovery of a judgment on the attachment process, [and] is not the type of 'interest in property' which can be perfected under Section 546(b) after the debtor files for bankruptcy." *See also In re DeLancey,* 77 B.R. 424 (Bankr. S.D.N.Y. 1987) (relying on *Savidge* and holding that under Pennsylvania law a prejudgment attachment is inchoate up until the time of judgment because until then the amount of the lien is not conclusively established).

In *A.I. Trade Finance, Inc. v. Petra Bank,* No. 89 Civ. 7987, 1997 WL 291841 (S.D.N.Y. June 2, 1997), the court held that the discharge for value rule is unavailable to a pre-judgment attachment creditor. Specifically, the court held that a prejudgment attachment is not the sort of "debt" or "lien" that the discharge for value rule contemplates:

> A.I. Trade argues that its attachment on Petra's account was a 'lien' on Petra's property, as contemplated by the discharge for value rule, and that BCP's payment to Petra's account served to discharge that lien. A lien is a claim or charge on property for payment of some debt, obligation, or duty *see 75 N.Y. Jur.2d. Liens §1.* A.I. Trade's order of attachment merely gave A.I. first dibs on Petra's account *if* A.I. won its lawsuit on the merits. *See* David Siegel, *New York Practice § 313,*

at 374 (West 1978). The attachment did not create for Petra any present debt, obligation or duty to A.I. Trade. The attachment provided security for a *'potential judgment'* against Petra Bank [citations omitted]. A.I. Trade's claimed 'lien' does not ripen until Plaintiff obtains a judgment in its favor [citations omitted]. Consequently, at the time of the mistaken transfer, A.I. Trade was not entitled to anything in Petra's attached accounts because A.I. Trade not had [sic] obtained any judgment in its favor. The discharge for value rule contemplates that at the time of the erroneous transfer the transferee/beneficiary have some present entitlement to the funds [citations omitted].

*Id.* at * 4.

Neither Deutsche Bank nor Mashreqbank should be accorded any deference as a "secured creditor" in these circumstances.

**D.      Additional Assistance under § 1507 also**
**Should Be Granted Here Based on Bahraini Law**

>      *1.      The Law of the Foreign Insolvency Forum Provides a Basis For Turnover under*
>      *§ 1507.*

As shown above, the standards for granting "additional assistance" to the Petitioner under § 1507 also have been met here.

In *Atlas,* on facts similar to this motion, Judge Glenn found that he could have applied Danish law directly to vacate the attachments as "additional assistance" to the foreign representative under § 1507, but in the circumstances did not need to do so because the relief sought by the Atlas trustee fell squarely within § 1521. *Atlas* correctly rejected the creditors' argument that Danish bankruptcy law should not be given extraterritorial effect. 404 B.R. at 735, n.4 (citing *In re Rosacometta S.r.l.*, 336 B.R. 557, 564 (Bankr. S.D.Fla. 2005) (recognizing Italy's automatic stay in an ancillary proceeding in U.S. and applying Italian law to avoid the garnishment)); *see also CSL Australia Pty. Ltd. v. Britannia Bulkers PLC*, No. 08 Civ. 8290, 2009 WL 2876250 *5 (S.D.N.Y. Sept. 8, 2009) (utilizing principles of international comity, Danish Bankruptcy Code directly applied to vacate maritime attachments pursuant to Supp. Adm. R. E(4)(f)).

By elevating international comity to the introductory paragraph of chapter 15, Congress did not intend to limit the scope of relief available to foreign representatives beyond the specific remedies enumerated at §§ 1521 and 1523(a). While it is clear that chapter 15 does not permit a foreign representative to bring U.S. law-based avoidance actions, *see* 11 U.S.C. §§ 1521(a)(7) and 1523(a), a Bankruptcy Court can apply the avoidance law of the jurisdiction where the foreign proceeding is pending. *See In re Condor Ins. Ltd.,* ___ F.3d ___, 2010 WL 961613, at *6-7 (5th Cir. Mar. 17, 2010).

In *Condor*, the Fifth Circuit examined the jurisdiction of a bankruptcy court to offer avoidance relief under foreign law in a chapter 15 proceeding. There, the foreign representative of a Nevis debtor alleged that the debtor fraudulently transferred over $313 million in assets to an affiliate of the debtor with the intent of placing that money outside the reach of creditors during the Nevis insolvency proceeding.

After carefully reviewing the statutory language and legislative history of chapter 15, and the previous case-law interpreting chapter 15's predecessor, § 304[17] the Fifth Circuit found that chapter 15 was "silent regarding proceedings that involve foreign law, including any rights of avoidance such law may offer." *Id.* at *2. The court further noted that "[g]enerally where there are enumerated exceptions 'additional exceptions are not to be implied, in the absence of a contrary legislative intent.'" *Id.* at *3 and n.22 (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)). The court further observed "if Congress wished to bar all avoidance actions whatever their source, it could have stated so; it did not." *Id.* Accordingly, *Condor* held

---

[17] In *Atlas*, Judge Glenn held that the legislative history confirms that the provisions of chapter 15 are to be read consistently with prior law under § 304 and that Congress is presumed not to have overturned precedent when amending the Bankruptcy Code. *Id.* at 744 (citing *In re Metzeler*, 78 B.R. 674, 679 (Bankr. S.D.N.Y. 1987)). Meanwhile, it cannot be disputed that § 304(b)(2) permitted a bankruptcy court to act as a forum for the assertion in the United States of avoiding powers and similar causes of action that are vested in the foreign representative under otherwise applicable law. *See* Collier on Bankruptcy ¶ 304.06; *Metzeler,* 78 B.R. at 680 ("Congress intended that foreign preference and fraudulent transfer actions seeking to recover property located here are a sufficient basis on which to ground a § 304 petition...").

that "Congress did not intend to restrict the powers of the U.S. court to apply the law of the country where the main proceeding pends." *Id.* at *6.

*Condor's* conclusion that a foreign representative may utilize the law of the country in which the main proceeding is pending is sound. Furthermore, it is clear from *CSL* that a U.S. District Court has the power under principles of international comity to vacate an attachment order using foreign law. As such, § 1507, which authorizes the Bankruptcy Court to provide "additional assistance" to the foreign representative, should be interpreted to permit this court to apply foreign bankruptcy law to vacate the Attachment Orders.

### 2. *The Attachments Would Be Dissolved Under Bahraini Law.*

As previously discussed, the Administrator is authorized under Bahrain law to apply to the court in Bahrain or to a foreign court to vacate an attachment where such action will serve the benefit of other creditors or the continuation of the attachment will harm other creditors' rights, which includes preventing preferences.

Here, the Deutsche Bank and Mashreqbank attachments are avoidable under Bahrain law as preferences because they occurred within six months before TIBC was placed into Administration. Additionally, neither Deutsche Bank nor Mashreqbank are entitled to any priority under Bahrain law as a result of their attachments. *See* Khalifa II at ¶¶ 26, 30-34.

The existence of the Attachments have hindered the Administrator's efforts to collect the substantial, multi-billion dollar sums owed to TIBC by third parties for the benefit of all creditors. To allow the Attachment Orders to stand would allow Deutsche Bank and Mashreqbank an unfair advantage over other TIBC creditors.

## CONCLUSION

For the foregoing reasons, this Court should grant Petitioner's request for the turnover of

TIBC's assets to the Administrator pursuant to 11 U.S.C. §§ 1521(a)(5), 1521(b) and 1507 for

administration in the foreign main proceeding in Bahrain.

Dated: New York, New York
      May 5, 2010

                HOLLAND & KNIGHT LLP


                By:    /s/ Barbra R. Parlin
                      James H. Hohenstein
                      H. Barry Vasios
                      Barbra R. Parlin
                      Warren E. Gluck
                      31 West 52nd Street
                      New York, New York 10019
                      Telephone: 212-513-3200
                      Telefax:    212-385-9010
                      Email: jim.hohenstein@hklaw.com
                              barry.vasios@hklaw.com
                              barbara.parlin@hklaw.com
                              warren.gluck@hklaw.com

                  *Counsel for the Administrator of*
                  *The International Banking Corporation B.S.C.*

# 9365388_v1