UNITED STATES BANKRUPTCY COURT     **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                         :
                             :    Chapter 15
THE INTERNATIONAL BANKING      :    Case No. 09-17318 (SMB)
CORPORATION B.S.C.,               :
                             :
         Debtor in a            :
         Foreign Proceeding.      :
-------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## REGARDING ATTACHED FUNDS

**A P P E A R A N C E S :**

HOLLAND & KNIGHT LLP
Attorneys for Trowers & Hamlins, External
   Administrator and Foreign Representative
   of the Debtor in a Foreign Proceeding
31 West 52nd Street
New York, New York 10019

       Barbara R. Parlin, Esq.
       H. Barry Vasios, Esq.
       Warren E. Gluck, Esq.
       James H. Hohenstein, Esq.
          Of Counsel

BINGHAM MCCUTCHEN LLP
Attorneys for Deutsche Bank AG
399 Park Avenue
New York, New York 10022

       Joshua Dorchak, Esq.
       Robert M. Dombroff, Esq.
       Todd B. Marcus, Esq.
          Of Counsel

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Attorneys for Mashreqbank PSC
One Liberty Plaza
New York, New York 10006

       Carmine D. Boccuzzi, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Trowers & Hamlins (the "Administrator"), administrator of foreign debtor The

International Banking Corporation B.S.C. ("TIBC"), moves for an order vacating state court

orders of attachment obtained by Deutsche Bank AG ("DB") and Mashreqbank PSC

("Mashreqbank", and together with DB, the "Banks"), and directing that the attached funds that

are currently held by the New York sheriff be turned over for administration in a foreign main

proceeding pending in Bahrain.  (Motion to Vacate Certain Orders of Attachment and Directing

the Turnover of Certain Attached Funds to the Administrator for Administration in the Foreign

Main Proceeding in Bahrain, filed May 5, 2010 ("Turnover Motion") (ECF Doc. # 30).)  The

Banks oppose the motion.

The tension in this case lies between protecting the rights of attaching creditors on the

one hand and promoting the interests of comity and deference to foreign proceedings under

chapter 15 of the United States Bankruptcy Code on the other.  The Administrator contends that

it is entitled to relief because the attachments are void under Bahraini law.  The Administrator

does not, however, ask this Court to decide that issue, and fails to explain how the attaching

creditors will be protected if the Administrator is wrong.  As the Administrator's motion is

ultimately committed to the Court's discretion, the Turnover Motion is denied without prejudice

for the reasons that follow.

## BACKGROUND

### A.    Introduction

TIBC is a banking entity formed in 2002 under Bahraini law with a principal place of

business in the Kingdom of Bahrain.  (Declaration of Abdullah Mutawi in Support of Petition for

Entry of Order, filed Dec. 14, 2009 ("Mutawi I"), ¶ 7 (ECF Doc. # 8); (Declaration of Abdullah

Mutawi in Support of Turnover Motion, filed May 5, 2010 ("Mutawi II"), at ¶ 2 (ECF Doc. #

32).)  It is (or was) licensed and regulated as a wholesale bank by the Central Bank of Bahrain

("CBB") pursuant to the Central Bank of Bahrain and Financial Institutions Law of 2006

("BCBL").[1]  (Mutawi I at ¶ 7.)  TIBC never maintained any offices, employees or agents in New

York.  (Mutawi II at ¶ 3.)

Historically, TIBC provided commercial loans and extended trade-related finance to its

customers.  (Mutawi I at ¶ 9.)  A substantial amount of TIBC's trading activities involved

transactions in which either TIBC or its counterparties were obligated to make or receive

payments in U.S. dollars by wire transfer.  (Id. at ¶ 11.)  Such payments were typically made

through correspondent bank accounts maintained by the parties at banks in New York.  (Id.)

The world-wide recession and a number of financial irregularities left TIBC in the throes

of a liquidity crisis that, by May 9, 2009, left it unable to pay its debts.  (Mutawi II at ¶ 5.)  These

problems were aggravated when various counterparties and creditors of TIBC exercised rights of

set-off and accelerated TIBC's long-term loans and letters of credit.  (Mutawi I at ¶ 17.)  TIBC

could not meet its immediate financial obligations and suspended payment on its debts and

obligations.  (Id.)  On May 12, 2009, Standard & Poor's downgraded its rating of TIBC's debt to

"SD" or "selective default," (id. at ¶ 18), and the CBB restricted the trading of TIBC.  (Id.)

TIBC ceased doing new business at or about this time, (id.), and has not conducted any business

since.  (Id. at ¶ 14.)

---

[1]    An unofficial English translation of the BCBL is attached as Exhibit A to the Supplemental Declaration of
Haya Rashid al Khalifa, filed Aug. 2, 2010 ("Khalifa IV") (ECF Doc. # 65).

B.    **The Attachments**

TIBC had engaged in one or more foreign exchange transactions ("FX Transaction") with DB and purported to have engaged in an FX Transaction with Mashreqbank involving currency swaps.  (Mutawi II at ¶ 5 & n.2).  The FX Transactions between DB and TIBC were governed by a master agreement ("DB Master Agreement"), (id., Ex. A), and related credit support annex, (id., Ex. B), each dated January 10, 2007 (collectively, the "DB Agreements").  (Id. at ¶ 8.) Pursuant to their agreements, DB delivered $59,762,440 to TIBC, (Declaration of Joshua Dorchak in Support of Limited Opposition of Deutsche Bank AG to Petition for Recognition, dated Jan. 6, 2010 ("Dorchak Decl."), at  ¶ 3 (ECF Doc. # 14)), and TIBC agreed to deliver £40 million to DB in London.  (Mutawi II at ¶ 8; see Dorchak Decl. at ¶ 3.)  The DB Agreements were negotiated and agreed to by TIBC employees in Bahrain and DB employees in London, (Mutawi II at ¶ 8), they are governed by English law, (DB Master Agreement at 34), and the parties consented to the non-exclusive jurisdiction of the English Courts.  (Id. at 20.)

The purported FX Transaction with Mashreqbank was negotiated and agreed to by TIBC employees in Bahrain and Mashreqbank employees in Dubai.[2]  (Mutawi II at ¶ 9.)  Pursuant to their alleged agreement, Mashreqbank delivered $75 million to TIBC on May 5, 2009, but TIBC failed to deliver Saudi Riyals to Mashreqbank on May 11, 2009, the contractual due date. (Mashreqbank PSC's Reservation of Rights and Joinder in Deutsche Bank AG's Opposition to TIBC Administrator's Motion for an Order Pursuant to 11 U.S.C. §§ 1521(a)(5), 1521(b), and 1507 Vacating Certain Orders of Attachment and Directing the Turnover of Certain Attached Funds to the Administrator for Administration in the Foreign Main Proceeding in Bahrain, dated June 14, 2010, at ¶ 1 (ECF Doc. # 46).)

---

[2]    The parties did not provide a copy of the transaction documents between Mashreqbank and TIBC.

On May 13, 2009, DB commenced an action against TIBC in New York County Supreme Court for sums alleged to be due in connection with the FX Transactions.  (Mutawi II at ¶ 5.) DB simultaneously moved for and obtained an ex parte temporary restraining order and order of attachment with respect to TIBC's property located in New York.  (Id.)  On May 22, 2009, Mashreqbank commenced a similar action against TIBC in New York County Supreme Court, seeking to recover amounts alleged to be due in connection with their purported FX Transaction. (Id. at ¶ 6.)  Mashreqbank also sought and obtained an order of attachment (collectively with DB's attachment order, the "Attachment Orders") with respect to TIBC's property located in New York.  (Id.)  After they were served with the Attachment Orders, TIBC's New York banks delivered the balances in TIBC's accounts to the custody of the New York County sheriff.  (Id. at ¶ 7.)  In total, $26,918,494.59 is being held by the New York County sheriff (the "Attached Funds"), and $2,353,828.84 is being held by HSBC Bank USA.[3]  (Id.)

## C.    The Commencement of the Foreign Proceeding

TIBC's financial affairs continued to worsen.  After the filing of the DB and Mashreqbank actions, TIBC's remaining counterparties terminated their relationships with TIBC, accelerated various long-term loan agreements and purported to set off debts immediately due and owing to TIBC.  (Mutawi I at ¶ 22.)  These actions left TIBC without sufficient operating capital to meet its daily operational needs.  (Id.)  By the end of July 2009, TIBC had liabilities of roughly $2.575 billion and had received several notices of default.  (Id. at ¶ 24.)

---

[3]       TIBC's ownership of the $2,353.828.84 is disputed by Bayersiche Hypo-Und Vereinsbank AG, a German bank, which claims it owns the HSBC funds.  Because of the dispute over ownership of the HSBC funds, the Administrator, at present, does not seek to vacate the Attachment Orders insofar as they relate to the HSBC funds, but reserves the right to do so in the future.  (Mutawi II at ¶ 7.)

On July 30, 2009, the CBB placed TIBC in Administration, and the Administrator was appointed as the external administrator of TIBC on August 6, 2009, (id. at ¶ 33), to supervise and manage TIBC's business.  (BCBL Art. 140; Mutawi I at ¶ 30.)  The commencement of Administration triggered an automatic stay against attempts to enforce interests in TIBC's property or the commencement or continuation of proceedings against TIBC or its property except with the approval of the Administrator or in the course of executing a court judgment or order issued before the Administration.  BCBL Art. 142.  Among other things, the CBB asked the Administrator to "identify the outstanding claims of creditors and . . . develop proposals for satisfying those claims to the extent permitted by the realizable assets of the bank."  (Mutawi I at ¶ 34.)

Toward that end, the Administrator requested that all creditors of TIBC submit a notice detailing the amounts due and basis for any claims against TIBC.  (Id. at ¶¶ 35–36.)  DB submitted a notice of claim, dated August 28, 2009, (id., Ex. D), and Mashreqbank submitted a notice of claim, dated August 30, 2009, (id., Ex. E), for the amounts owed in relation to the FX Transactions.  The Administrator has received claim forms from TIBC's creditors representing 88% of TIBC's debts, and has completed its assessment of TIBC's financial state and the outstanding claims.  (Mutawi II at ¶ 11.)

The period of administration cannot last more than two years.  By then, the Administrator must submit a petition to a Bahraini Court for either (1) compulsory liquidation of TIBC; or (2) termination of the administration and restoration of TIBC to its management and shareholders.  (See BCBL Art. 143; Mutawi I at ¶ 28.)  It appears that liquidation of TIBC will follow the period of administration.

**D.      The Commencement of the Chapter 15**

TIBC filed its chapter 15 petition on December 14, 2009, (ECF Doc. # 1), and on January 15, 2010, this Court entered an Order recognizing the Administration as a foreign main proceeding and the Administrator as a foreign representative under chapter 15 of the Bankruptcy Code.  (Order Pursuant to 11 U.S.C. §§ 105(a), 1504, 1515, 1517, 1519, 1520 and 1521 Recognizing Foreign Main Proceeding and Granting Further Relief, signed Jan. 15, 2010 ("Recognition Order") (ECF Doc. # 24).)  The Recognition Order specified that the New York County sheriff would continue to hold the Attached Funds pending further order this Court.  (Id. at ¶ 9.)

The Administrator subsequently moved in this Court to vacate the Attachment Orders and to turn over the Attached Funds for administration in Bahrain.  (Motion to Vacate Certain Orders of Attachment and Directing the Turnover of Certain Attached Funds to the Administrator for Administration in the Foreign Main Proceeding in Bahrain, dated May 5, 2010 (ECF Doc. # 30).)  The Administrator maintains that that the Attached Funds are part of TIBC's estate and should, therefore, be turned over to the Administrator for disposition in the Bahraini proceedings under principles of international comity as reflected in sections 1507, 1521(a)(5), and 1521(b) of the Bankruptcy Code, and the provisions of Bahraini law governing the Administration of insolvent Bahraini banks.  (Memorandum of Law in Support of Motion for an Order Vacating Certain Orders of Attachment and Directing Turnover of Certain Attached Funds to the Administrator for Administration in the Foreign Main Proceeding in Bahrain, dated May 5, 2010 ("TIBC Memo"), at 12–13 (ECF Doc. # 34).)

DB filed opposition, (Memorandum of Law in Opposition to the Administrator's Motion to Vacate Certain Orders of Attachment and Directing the Turnover of Certain Attached Funds,

filed June 14, 2010 ("DB Memo") (ECF Doc. # 44)), in which Mashreqbank joined.

(Mashreqbank PSC'S Reservation of Rights and Joinder in Deutsche Bank AG's Opposition to

TIBC Administrator's Motion, filed June 14, 2010 (ECF Doc. # 46).)  First, DB argues that it has

a valid security interest in the Attached Funds under New York law, and the Administrator's

contention that DB is similarly situated to TIBC's unsecured creditors is wrong.  (DB Memo at

4–7.)  Second, Bahraini law provides no basis for depriving DB of its security interest in the

Attached Funds.  (Id. at 7.)  The BCBL prioritizes the rights of secured creditors, and the

Attached Funds are, therefore, available for DB to satisfy the secured portion of its claim.  (Id. at

7–8.)  Although the BCBL contains a preference provision, it only applies in liquidations, (id. at

8–9), and a separate avoidance provision in the Bahrain Civil and Commercial Procedures Law

(the "CCPL") is inapplicable because it concerns commercial litigation undertaken in Bahrain,

and not in foreign courts.  (Id. at 10–11.)  Third, even if Bahraini law permitted vacating the

Attachment Orders, comity is not presumed.  (Id. at 11–13.)  Under the Second Circuit's ruling

in Bank of N.Y. v. Treco (In re Treco), 240 F.3d 148 (2d Cir. 2001), this Court is required to

protect a secured creditor in the United States from being reduced to an unsecured status in a

foreign proceeding.  (DB Memo at 11–16.)

## DISCUSSION

As the proposed turnover directly affects the rights obtained by the Banks through the

Attachments, we begin with a discussion of those rights.  The parties agree that the Banks' rights

are determined under New York law.  (See TIBC Memo at 22 ("Under the Bankruptcy Code,

property rights (such as 'secured' status) are determined with reference to state law.  New York

law applies to Deutsche Bank and Mashreqbank's prejudgment attachments here.") (internal

citation omitted); <u>DB Memo</u> at 4 ("[T]he question of whether DB is a secured creditor under the Bankruptcy Code is determined by New York law.").)

## A.    Attachment Creates a Judicial Lien Under New York Law

New York attachments are governed by Article 62 of New York's Civil Practice Law & Rules, N.Y. C.P.L.R. 6201 <u>et seq.</u> ("CPLR").  <u>OSRecovery, Inc. v. One Groupe Intern., Inc.</u>, 305 F. Supp. 2d 340, 348 (S.D.N.Y. 2004); <u>see</u> Fed. R. Civ. P. 64 (remedy of attachment is governed by law of forum state).  "New York's nonresident attachment statute is designed to serve two independent purposes: obtaining jurisdiction over and securing judgments against nondomiciliaries residing without the state."  <u>ITC Entm't, Ltd. v. Nelson Film Partners</u>, 714 F.2d 217, 220 (2d Cir. 1983).  Thus, even when the court has jurisdiction over a nonresident defendant, an attachment is permitted for security purposes.  <u>Id.</u> (citing <u>Dean v. James McHugh Constr. Co.</u>, 352 N.Y.S.2d 310, 311 (1974)); <u>accord</u> <u>Computerland Corp. v. Batac, Inc.</u>, 88 Civ. 8624 (SWK), 1989 WL 47294, at *2 (S.D.N.Y. 1989); <u>Elton Leather Corp. v. First General Resources Co.</u>, 529 N.Y.S.2d 769, 771–72 (1st Dep't. 1988); <u>Reich v. Spiegal</u>, 140 N.Y.S.2d 722, 727 (Sup. Ct. 1955) (attachment constitutes security for payment of a debt if a debt is found to exist).

An order of attachment, standing alone, gives no greater rights to the attaching creditor. "Under New York law, an attaching creditor must deliver the order of attachment to the sheriff in order to obtain priority in specific property or a debt."  <u>In re IDI Const. Co., Inc.</u>, 345 B.R. 60, 68 (Bankr. S.D.N.Y. 2006) (citing CPLR 6203).  Upon delivery to the sheriff but prior to levy, the plaintiff's rights in the attached debt or property are superior to the rights of a subsequent transferee except a transferee who gives fair consideration or receives the transfer without

knowledge of the order of attachment.  CPLR 6203.[4]  Once the sheriff levies by serving the order

of attachment on the garnishee or person in possession of the property, see CPLR 6214(a), the

attaching creditor's rights can only be defeated by a transferee without knowledge of the levy.

CPLR 6203.  If the sheriff seizes the attached property, the lien is perfected against all

transferees.  Vincent C. Alexander, Practice Commentaries: CPLR 6203, at 86–87 (McKinney

2010) ("If. . . the sheriff has actual possession of the property at the time of transfer, not even a

transferee who paid fair consideration gets priority because he is charged with knowledge of the

levy if it was in the sheriff's possession.")  If the levy has remained effective through the

issuance of execution on a judgment in favor of the attaching creditor, the sheriff must treat the

distrained property as though the levy was made pursuant to the execution.  Vincent C.

Alexander, Practice Commentaries: CPLR 6226, at 273 (McKinney 2010); see CPLR 6226.  If a

judgment is entered in the defendant's favor, the order of attachment is annulled.  CPLR 6224.

       The attachment provisions of the CPLR give the attaching creditor a priority in the

distrained property which it can look to in satisfaction of a future judgment.  Although the CPLR

does not describe the priority as a "lien," the description fits.  A lien is "[a] legal right or interest

that a creditor has in another's property lasting usu. until a debt or duty that it secures is

satisfied."  BLACK'S LAW DICTIONARY 1006 (9th ed. 2009); accord WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY UNABRIDGED 1306 (1981) (defining "lien" as "a charge upon real

---

[4]       Section 6203 provides:

       Where a plaintiff has delivered an order of attachment to a sheriff, the plaintiff's rights in a debt
       owed to the defendant or in an interest of the defendant in personal property against which debt or
       property a judgment may be enforced, are superior to the extent of the amount of the attachment to
       the rights of any transferee of the debt or property, except:

       1.  a transferee who acquired the debt or property before it was levied upon for fair consideration
       or without knowledge of the order of attachment; or

       2.  a transferee who acquired the debt or property for fair consideration after it was levied upon
       without knowledge of the levy while it was not in the possession of the sheriff.

or personal property for the satisfaction of some debt or duty ordinarily arising by operation of

law **:** a right in one to control or to hold and retain or enforce a charge against the property of

another until some claim of the former is paid or satisfied"); 11 U.S.C. § 101(37) ("The term

'lien' means charge against or interest in property to secure payment of a debt or performance of

an obligation.").  The attaching creditor's priority secures the defendant's debt contingent on the

entry of judgment in the former's favor.  Not surprisingly, the priority granted by the attachment

has been described as a "lien" by (1) commentators, 7 C.J.S. Attachment § 263 (2010) ("An

attachment creates a lien or encumbrance on the property attached, especially when levied on the

property, and certainly after it is carried into a judgment or decree.  A lien is perfected when the

attachment suit ends in a judgment for the plaintiff.") (footnotes omitted); 1-28 WEINSTEIN,

KORN, & MILLER, CPLR MANUAL § 28.07 (2010) (party who obtains an order of attachment and

delivers it to the sheriff obtains a lien on the defendant's personal property); David Gray Carlson

& Paul M. Shupack, Judicial Lien Priorities Under Article 9 of the Uniform Commercial Code:

Part I, 5 Cardozo L. Rev. 287, 297–98 (1983–1984) ("New York's prelevy attachment procedure

may well produce America's weakest lien, but it is a lien nevertheless. . . . Vast numbers of other

transferees are protected from the lien, but this extensive protection does not negate the existence

of the lien; such protection merely whittles away the utility of the lien to the plaintiff.") (footnote

omitted); THOMAS MCGANNEY & OWEN C. PELL, 6 BUSINESS & COMMERCIAL LITIGATION IN

FEDERAL COURTS § 70:27 (2d ed. 2009) (prejudgment attachment creates a security interest

which protects attaching creditor from any unsecured creditors), (2) courts, e., g., Lankenau v.

Coggeshall & Hicks, 350 F.2d 61, 64 (2d Cir. 1965) (attachment under CPLR Article 62 creates

a lien that is contingent and inchoate); Marschalk Co. v. Iran Nat'l Airlines Corp., 518 F. Supp.

69, 98 (S.D.N.Y.) ("Under the law of New York, when a levy is made under an order of

11

attachment, a lien is created in favor of the creditor upon the property attached."), rev'd on other grounds, 657 F.2d 3 (2d Cir. 1981); Steingut v. Nat'l City Bank, 38 F. Supp. 451, 452 (S.D.N.Y. 1941) ("Under the laws of the State of New York, the attachments when levied imposed a lien upon the debt, if any, owed by the defendant to the [attaching creditor]."); cf. Hartford Provision Co. v. United States, 579 F.2d 7, 9 (2d Cir. 1978) (Prejudgment attachment "permits the plaintiff to obtain security for the satisfaction of any judgment which he may finally recover.") (decided under Connecticut law); McFarland v. Brier, 850 A.2d 965, 981 (R.I. 2004) ("[A]n attachment creates a lien on the property attached which is held in the custody of the law to satisfy such judgment.") (internal quotation marks and citation omitted) (decided under Rhode Island law); but see A.I. Trade Fin. Co. v. Petra Bank, No. 89 Civ. 7987 (JFK), 1997 WL 291841, at *4 (S.D.N.Y. June 2, 1997),[5] and inferentially, (3) by various statutory definitions of "lien." E.g., 11 U.S.C. § 101(36) ("The term 'judicial lien' means lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding."); N.Y. U.C.C. § 9-102(a)(52)(A) ("'Lien creditor' means . . . a creditor that has acquired a lien on the property involved by attachment, levy, or the like.")

In the instant case, it is undisputed that the New York County sheriff duly levied on and acquired possession of the Attached Funds in accordance with the CPLR. The Banks obtained a

---

[5]    A.I. Trade concluded that the attachment did not create a lien that could be discharged for value because the defendant did not owe a present debt; the attachment only provided security for a "potential judgment" and did not ripen until the plaintiff obtained a judgment in its favor. 1997 WL 291841, at *4; but see Lankenau, 350 F.2d at 64–65 (attachment creates a lien that is contingent and inchoate, and stands as security for a possible judgment). The A.I. Trade court concluded that because of its unperfected or unripened nature, a party that had mistakenly paid funds on behalf of the defendant to the garnishee could recover them. 1997 WL 291841, at *4. In the present case, the dispute lies between the attaching creditors and the defendant's successor, not between the attaching creditors and an innocent third party that made a mistake. The Attachment Orders coupled with the seizure of the Attached Funds unquestionably prevented TIBC, and hence, the Administrator, from using the funds.

judicial lien securing their contingent judgment that is perfected under New York law as against all third parties.

## B.    Attachments Under Bahraini Law

Any distribution to TIBC's creditors in the liquidation proceeding that will probably follow the Administration will be made in accordance with the priorities set forth in Article 156 of the BCBL.  (Declaration of Haya Rashed Al Khalifa in Support of Turnover Motion, filed May 5, 2010 ("Khalifa II"), at ¶ 18 (ECF Doc. # 33).)  Article 156(c) provides that "secured debts" will have priority over all other claims with respect to the collateral that secures such claims.  Hence, a "secured debt" has priority in its collateral—even over the fees and expenses of the Administrator and Liquidator.  (Id. at ¶ 20.)

Nevertheless, while an attaching creditor holds a judicial lien under New York law, the status of the attachment, which underlies its position as a secured creditor, is less certain under Bahraini law.  CCPL Art. 176, which regulates the imposition of protective and interim procedures, states:

> The Court may on application of the plaintiff order all or some of the defendant's property to be placed under precautionary sequestration if the plaintiff has serious grounds for fearing that the defendant will abscond or smuggle[6] his property abroad or dispose of it with the intention of obstructing or delaying any order or decision issued against him.

(See id. at ¶ 22 (quoting statute).)  The Article 176 attachment is a protective measure ordered by the court based on the "fear" that the debtor will render himself judgment-proof, and the attachment will continue until final judgment unless overruled upon objection by the defendant. (Id. at ¶ 26(a).)  It does not create a security interest under Bahraini law, (Reply Declaration of

---

[6]    "'Smuggle' means to transfer, hide or sell assets in an attempt to prevent execution against property." (Khalifa II at ¶ 23.)

Haya Rashed Al Khalifa, filed June 29, 2010 ("Khalifa III"), at ¶¶ 14–15, 30(d) (ECF Doc. #

63)), although as noted, both sides acknowledge that the Banks' status presents a question of

New York law.  Furthermore, after a final judgment, and subject to the rights of prior secured

creditors in the same property, the attaching creditor may look to the attached property for

payment; any remaining property will be made available to the debtor's other creditors.  (Khalifa

II at ¶ 26(a).)  If, on the other hand, the attaching creditor does not obtain a final judgment, the

attached funds will be available to satisfy the claims of the debtor's other creditors.  (Id. at ¶

26(c).)

The Administrator's expert in Bahraini law has concluded that the Bahraini court would

likely vacate the Attachment Orders on several grounds.  The Administrator is empowered to

"suspend or limit the discharge of financial obligations of the Licensee," BCBL Art. 140(a)(2);

the element of "fear" required by CCPL Art. 176 has been eliminated, and moreover, the Banks'

claims have not been reduced to judgment; the Attachments create de facto preferences, (Khalifa

III at ¶ 28), and the Administrator is authorized under BCBL Art. 140(b)(6) to "[u]ndertake any

necessary actions in the interest of the Licensee and for the protection of the interests of its

customers and creditors."  Under BCBL Art. 140(b)(6), the Administrator can seek to avoid

preferences that otherwise benefit one creditor over other similarly situated creditors in an unfair

manner.  (Khalifa II at ¶¶ 27–31.)[7]

Not surprisingly, DB (and Mashreqbank) disagree.  First, any relief available to the

Administrator under CCPL Art. 176 would not apply to attachments issued by a New York court.

---

[7]     The Administrator also appeared to contend that the attachments were voidable preferences under BCBL
Art. 158(a), (see Khalifa II at ¶¶ 33, 35–36, but now concedes that Article 158(a), which only applies in liquidation
proceedings, is not available to the Administrator.  (See Khalifa III at ¶¶ 27–28.)  Hence, I refrain from further
discussing this provision or the parties' positions regarding its effect.

(See Declaration of Hatim S. Zu'bi in Opposition to Motion to Vacate Attachments and For Turnover of Attached Funds, filed June 14, 2010 ("Zu'bi I"), at ¶¶ 17–20 (ECF Doc. # 45).) Second, BCBL Art. 140(a)(2) is limited, by its express terms, to powers necessary to the "management and running of the business of the Licensee." TIBC is not operating, and the Administrator is not managing or running its business.[8] (Id. at ¶¶ 21–23.) In addition, Article 140(a)(2) only grants temporary relief from the performance of contractual obligations, and does not authorize the Administrator to permanently nullify claims. (Id. at ¶ 24.)

Nevertheless, DB's expert does not appear to dispute the Administrator's position that it has the power to seek to avoid a de facto preference, and does not challenge the notion that the Banks' attachments might qualify as de facto preferences. Rather, he maintains that the Administrator's power is limited to preferences that benefit "one creditor over similarly situated creditors in an unfair manner," (id. at ¶ 26 (quoting Khalifa II at ¶ 31)), issues that must be determined under the BCBL by a court. (See Zu'bi I at ¶ 27.) Neither the Administrator nor DB has explained the precise contours of the de facto preference doctrine, or when a preference is "unfair." In short, the parties sharply dispute the Administrator's ability to vacate the Attachment Orders under Bahraini law, and as presented by their experts, the disagreement is in large part factual and requires a trial to resolve. The question presented by the Administrator's motion is whether, in light of these circumstances, the Court should exercise the discretion afforded under chapter 15 and vacate the Attachment Orders and direct the turnover of the Attached Funds to the Administrator.

---

[8]     The Administrator's expert did not challenge this contention in Khalifa III.

C.     **Chapter 15**

1.     **Introduction**

Congress adopted chapter 15 as part of the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005.  Chapter 15 incorporates the Model Law on Cross-Border Insolvency

(the "Model Law") promulgated by the United Nations Commission on International Trade Law

("UNCITRAL").  11 U.S.C. § 1501(a).  It is intended to promote "cooperation between United

States courts, trustees, examiners, debtors and debtors in possession and the courts and other

competent authorities of foreign countries; greater legal certainty for trade and investment; fair

and efficient administration of cross-border insolvencies that protects the interests of all creditors

and other interested entities, including the debtor; the protection and maximization of the

debtor's assets; and the facilitation of the rescue of financially troubled businesses."  In re Bear

Stearns High-Grade Structured Credit Strategies Master Fund, 374 B.R. 122, 126 (Bankr.

S.D.N.Y. 2007); accord 11 U.S.C. § 1501(a).

"In interpreting this chapter, the court shall consider its international origin, and the need

to promote an application of this chapter that is consistent with the application of similar statutes

adopted by foreign jurisdictions."  11 U.S.C. § 1508.  "As each section of Chapter 15 is based on

a corresponding article in the Model Law, if a textual provision of Chapter 15 is unclear or

ambiguous, the Court may then consider the Model Law and foreign interpretations of it as part

of its 'interpretive task.'"  In re Loy, 432 B.R. 551, 560 (E.D. Va. 2010) (footnote omitted)

(citing 11 U.S.C. § 1508; In re Condor Ins. Ltd., 601 F.3d 319, 321 (5th Cir. 2010)).  When

interpreting Chapter 15, the Court should also consult the GUIDE TO ENACTMENT OF THE

UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY (the "GUIDE") promulgated by

UNCITRAL.  See H.R. Rep. No. 109-31, at 105 (2005); LEIF M. CLARK, ANCILLARY & OTHER

CROSS-BORDER INSOLVENCY CASES UNDER CHAPTER 15 OF THE BANKRUPTCY CODE § 3[1][a][i],
at 17 (2008) ("CLARK").  In addition, the Court should read Chapter 15 read consistently with
prior law under section 304.  In re Atlas Shipping A/S, 404 B.R. 726, 738–39 (Bankr. S.D.N.Y.
2009).

     The Second Circuit has frequently underscored the importance of judicial deference to
foreign bankruptcy proceedings.  See, e.g., Finanz AG Zurich v. Banco Economico S.A., 192
F.3d 240, 246 (2d Cir. 1999); Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell
Commc'n Corp.), 93 F.3d 1036, 1048 (2d Cir. 1996); Allstate Life Ins. Co. v. Linter Group Ltd.,
994 F.2d 996, 999 (2d Cir. 1993); Cunard S.S. Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 458
(2d Cir. 1985).  "[D]eference to foreign insolvency proceedings will, in many cases, facilitate
'equitable, orderly and systematic' distribution of the debtor's assets."  Maxwell Commc'n
Corp., 93 F.2d at 1048 (quoting Cunard S.S. Co., 773 F.2d at 458); accord JP Morgan Chase
Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 424 (2d Cir. 2005) ("We have
repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are
the subject of a foreign bankruptcy proceeding. . . .  In such cases, deference to the foreign court
is appropriate so long as the foreign proceedings are procedurally fair and (consistent with the
principles of Lord Mansfield's holding) do not contravene the laws or public policy of the United
States."); Finanz AG Zurich, 192 F.3d at 246 ("We have repeatedly noted the importance of
extending comity to foreign bankruptcy proceedings.  Since '[t]he equitable and orderly
distribution of a debtor's property requires assembling all claims against the limited assets in a
single proceeding,' American courts regularly defer to such actions.") (quoting Victrix S.S. Co.,
S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713–14 (2d Cir. 1987)); Cunard S.S. Co., 773 F.2d

at 458 ("American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.")[9]

Section 1521 of the Bankruptcy Code embodies this principle of deference, and authorizes the Bankruptcy Court, among other things, to entrust the debtor's assets to the foreign representative following recognition.  It provides, in pertinent part, as follows:

> (a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—
>
> . . . .
>
> > (5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court. . . .
>
> (b) Upon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.

Section 1521(a)(5) permits the court to entrust the administration or realization of the debtor's United States assets to the foreign representative.  11 U.S.C. § 1521(a)(5).  "Incident to the task of administering and realizing assets of the debtor within the U.S. is the need to obtain affirmative control over such assets.  It may be necessary to obtain turnover of assets in the hands of third parties."  Atlas, 404 B.R. at 740 (quoting CLARK § 7[2], at 73).  "Entrustment"

---

[9]    In In re Koreag, Controle et Revision S.A., 961 F.2d 341 (2d Cir. 1992), decided under former § 304, the Court recognized an exception to the general rule of deference; "[B]efore a particular property may be turned over pursuant to § 304(b)(2), a bankruptcy court should apply local law to determine whether the debtor has a valid ownership interest in that property when the issue is properly posed by an adverse claimant."  Id. at 349.  In Altos Hornos de Mexico, the Second Circuit explained that the Koreag exception required the local court to resolve all threshold disputes regarding ownership of the property.  412 F.3d at 426.  Here, the Attached Funds are TIBC's property, subject to the interests acquired by the Banks by virtue of the attachments.  Accordingly, the Koreag exception does not apply.  Atlas, 404 B.R. at 734 n.5 (Koreag exception does not apply when the dispute relates to the parties' respective rights in distrained property).

under § 1521(a)(5) does not authorize the foreign representative to distribute the funds to the

debtor's creditors.  Rather, under section 1521(b), the foreign representative may be entrusted

with "the distribution of all or part of the debtor's assets located in the United States . . . provided

that the court is satisfied that the interests of creditors in the United States are sufficiently

protected."  11 U.S.C. § 1521(b); accord Atlas, 404 B.R. at 740; In re Tri-Cont'l Exchange, Ltd.,

349 B.R. 627, 636 (Bankr. E.D. Cal. 2006) (distinguishing between "entrustment" under §

1521(a)(5) and § 1521(b)).

Turnover, like the other remedies provided in § 1521, is discretionary.[10]  In re Bear

Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 389 B.R. 325, 333 (S.D.N.Y.

2008) (In contrast to recognition, which turns on "strict application of objective criteria," post-

recognition relief is "largely discretionary . . . ."); see 11 U.S.C. § 1521; GUIDE ¶ 157 ("The

'turnover' of assets to the foreign representative (or another person) . . . is discretionary.").

Although turnover under § 1521(b) requires the Court to ensure "that the interests of creditors in

the United States are sufficiently protected"—and the Administrator argues that the Banks are

---

[10]     The Administrator also relies on § 1507 to support its application.  Section 1507 is a "catch-all" provision
that permits the Court to provide "additional assistance" to the foreign representative.  Condor Ins., 601 F.3d at 325;
Atlas, 404 B.R. at 741 n.11.  Like section 1521, relief under section 1507 is discretionary.  See Bear Stearns, 389
B.R. at 333 ("[R]elief is largely discretionary and turns on subjective factors that embody principles of comity.").
"The legislative history of § 1507 states specifically that 'additional relief' is 'beyond that permitted under §§ 1519–
1521,'" Allan L. Gropper, Current Developments in International Insolvency Law: A United States Perspective, 887
PLI/Comm 815, 830 (2006), and the parties cannot use section 1507 to evade other restrictions on relief.  Condor
Ins., 601 F.3d at 325 n.32; CLARK, § 7[3] at 76.  Because the requested relief——"entrustment" or turnover of the
Attached Funds—is explicitly treated in section 1521, this Court need not decide whether relief would be
appropriate under section 1507.  See Atlas, 404 B.R. at 741 ("The interplay between relief available under §§ 1507
and 1521 is far from clear . . . [but] [t]he [turnover] relief sought by the foreign representative is expressly provided
for in §§ 1521(a)(5) and 1521(b).  The Court need not venture into the area of 'additional assistance,' 'consistent
with the principles of comity' under § 1507.")

not United States creditors—this does not mean that the Court can ignore their interests and

direct turnover even if the Administrator is right.

The Court may not grant relief under § 1521, unless "the interests of the creditors and

other interested entities, including the debtor, are sufficiently protected," 11 U.S.C. § 1522(a),

and may subject any relief granted "to conditions it considers appropriate, including the giving of

security or the filing of a bond." 11 U.S.C. § 1522(b). "The idea underlying [§ 1522] is that

there should be a balance between relief that may be granted to the foreign representative and the

interests of the persons that may be affected by such relief." GUIDE ¶ 161. This section is based

on Model Law article 22, and gives the bankruptcy court "broad latitude to mold relief to meet

specific circumstances." Tri-Cont'l Exch., 349 B.R. at 636–37 (citing H.R. Rep. No. 109-31, at

116 (2005)). In refusing to limit article 22 to "local creditors," the drafters recognized the

practical difficulties and inherent dangers in attempting to carve out and discriminate in favor of

such a class:

> In many cases the affected creditors will be "local" creditors.
> Nevertheless, in enacting article 22, it is not advisable to attempt to limit it to
> local creditors. Any express reference to local creditors in paragraph 1 would
> require a definition of those creditors. An attempt to draft such a definition (and
> to establish criteria according to which a particular category of creditors might
> receive special treatment) would not only show the difficulty of crafting such a
> definition but would also reveal that there is no justification for discriminating
> [sic] creditors on the basis of criteria such as place of business or nationality.

GUIDE ¶ 163.

In addition, Chapter 15 grants secured creditors like the Banks the same protections that

they would enjoy in a plenary bankruptcy case. Recognition triggers the applicability of §§ 361

and 363 of the Bankruptcy Code. 11 U.S.C. § 1520(a)(1)–(2). As a result, the Attached Funds

are the Banks' cash collateral, and the Administrator cannot use their cash collateral without

their consent or an order of this Court.  11 U.S.C. § 363(c)(2); see Tri-Cont'l Exchange, 349 B.R. at 639.  Furthermore, the Administrator must provide the Banks with adequate protection before it can use their cash collateral.  E.g., In re Delco Oil, 599 F.3d 1255, 1258 (11th Cir. 2010); In re Blackwood Assocs., L.P., 153 F.3d 61, 67 (2d Cir. 1998); In re Vienna Park Props., 976 F.2d 106, 144 (2d Cir. 1992); see 11 U.S.C. § 363(e).

The Banks' concern, whether viewed in terms of "sufficient protection" under § 1522(a) or "adequate protection" under §§ 361 and 363, goes to the core of the dispute.  The Banks do not contend that Bahraini law is inconsistent with our own notions of fairness, violates our public policy, or will deprive them of due process of law.  Consequently, the Court would not hesitate to vacate the Attachment Orders and order the turnover of the Attached Funds if the attachment occurred after the commencement of the Bahraini proceeding, e.g., Victrix, 825 F.2d at 714 ("By attaching Salen's local assets after its declaration of bankruptcy, Victrix attempted to secure a 'captive fund' to satisfy the anticipated arbitration award. . . . We will not aid Victrix's effort to evade the writ of the Swedish bankruptcy court.") (citation omitted); Cunard, 773 F.2d at 459 (ordering turnover of funds attached by general creditor after the foreign debtor had filed its bankruptcy petition); In re Milovanovic, 357 B.R. 250, 256 (Bankr. S.D.N.Y. 2006) (rejecting argument under former § 304 of the Bankruptcy Code that attaching creditor was secured where attachment was obtained after the commencement of the Serbian bankruptcy proceeding and in violation of the Serbian stay);  In re Rosacometta, S.R.L., 336 B.R. 557, 563–64 (Bankr. S.D. Fla. 2005) (voiding a garnishment obtained by United States creditor in violation of Italian stay pursuant to former § 304 of the Bankruptcy Code), aff'd,  244 Fed. Appx. 286 (11th Cir. June 29, 2007), or the Attachment Orders were plainly void or voidable under the law of the jurisdiction where the foreign bankruptcy is pending.  E.g., CSL Australia Pty. Ltd. v. Britannia Bulkers

PLC, No. 08 Civ. 8290 (PKL), 2009 WL 2876250, at *4 (S.D.N.Y. Sept. 8, 2009) (vacating pre-petition attachments where "the Trustee and the presiding judge in Britannia A/S's bankruptcy case represent that, under [the Danish bankruptcy code], attachments made prior to commencement of the Danish bankruptcy case automatically and unconditionally lapse."); Atlas, 404 B.R. at 736 ("Based upon that record, application of Danish law would also result in the dissolution of the two pre-Danish-bankruptcy attachments as well. As a result, these two attachments will also be dissolved."); In re Culmer, 25 B.R. 621, 629 (Bankr. S.D.N.Y. 1982) (directing turnover of attached funds to Bahamian liquidator where attachments "would grant [the attaching creditors] preferences to which they are not entitled either in a Bahamian liquidation . . . or in a United States bankruptcy").[11]

Here, however, the attachments were not wrongful; the Attachment Orders were issued and perfected prior to the commencement of the Bahraini proceeding and before the imposition of the Bahraini stay.  In addition, it is far from clear that the Administrator can vacate the Attachment Orders, or the rights that they confer, under Bahraini law.  The Court has recounted the differing opinions of the parties' experts, and as noted, the outcome will turn on the resolution of factual disputes and the exercise of discretion.  The Administrator nevertheless proposes to vacate the Attachment Orders and send the Attached Funds to Bahrain, assuring the Court that this action would not prejudice the Banks' rights.  (See Reply Memorandum of Law in Support of Motion for an Order Pursuant to 11 U.S.C. §§ 1507,1521(a)(5) and 1521(b) Vacating Certain Orders of Attachment and Directing the Turnover of Certain Attached Funds to the Administrator for Administration in the Foreign Main Proceeding in Bahrain, filed June 29,

---

[11]    Culmer was decided under former § 304 of the Bankruptcy Code.  Section 1521 does not allow the foreign representative to exercise a trustee's right to avoid a preference under § 547.

2010, at 3 (ECF Doc. # 62) ("An order under sections 1521(a)(5) and 1521(b) requiring that the Attached Funds be turned over to the Administrator does not prevent DB from making any arguments in Bahrain that it may have as to the effect of the pre-judgment attachments.").)

This puts the cart before the horse. The Attachment Orders created the judicial lien and the New York County sheriff's seizure of the Attached Funds perfected the Banks' judicial lien. If the Court vacates the Attachments Orders and "unseizes" the Attached Funds, entrusting the Attached Funds to the Administrator for administration in Bahrain, the Banks' are justifiably concerned that "there will be no attachments that could be 'upheld' in the Administration. Thus, the Administrator essentially asks this Court to destroy DB's security interest even though it might be found valid (as it should be) in the Administration." (DB Memo at 13.) In short, a turnover order may grant the Administrator the ultimate relief it seeks but is not entitled to in the first place.

The Administrator has not explained how it intends to protect the Banks' lien in its cash collateral if the Court vacates the Attachment Orders and directs the turnover of the Attached Funds for administration in Bahrain. Balancing the interests of the parties in this case weighs against vacating the Attachment Orders or releasing the Attached Funds until the validity of the Attachment Orders is resolved. The preferable course is to defer to the Bahraini court to resolve the issue, and then allow the prevailing party to return to this Court and ask that comity be afforded to the Bahraini court's decision. Toward that end, I asked the parties to provide expert opinions on two related questions: (1) whether the Bahraini court could issue a ruling, notwithstanding that the Attached Funds are in New York; and (2) whether the Bahraini court would likely exercise such jurisdiction.

Both experts agreed that the Bahraini court would probably not assume jurisdiction over the Attached Funds while they are in New York.  (Khalifa IV at ¶ 10; Supplemental Declaration of Hatim S. Zu'bi in Opposition to Motion to Vacate Attachments and For Turnover of Attached Funds, filed Aug. 2, 2010 ("Zu'bi II"), at ¶ 7 (ECF Doc. # 64).)  Nevertheless, the Administrator's expert suggested two circumstances in which a Bahraini court would decide the underlying issue of voidability, especially where personal jurisdiction existed over both the Administrator and DB.  (See Khalifa IV at ¶ 13.)  First, the parties could consent to the jurisdiction of the Bahraini court.  (Id. at ¶ 14.)  Second, this Court could instruct the parties to seek such a ruling.  (Id. at ¶ 15.)

DB's expert disagreed.  While the Bahraini would not necessarily require jurisdiction over the Attached Funds to avoid the Attachment Orders, it would be reluctant to interfere with this Court's authority to decide whether DB was a secured creditor under New York law.  (Zu'bi II at ¶ 11.)  Finally, if the Administrator asked the Bahraini court to assume the two possible outcomes of that litigation—DB was either secured or unsecured—and rule on both possibilities, the Bahraini court would refuse to decide a hypothetical dispute.  (Id. at ¶ 13.)

The uncertainty that concerned DB's expert has been eliminated by this Court's determination that the Banks hold judicial liens in the Attached Funds under New York law. Their secured status does not, however, immunize their liens from attack under Bahraini law any more than it would under United States law.  Accordingly, the Court directs the parties to consent to the jurisdiction of the Bahraini court to decide the voidability of the Attachment Orders, and further directs them to seek a ruling from the Bahraini court as to the voidability of the Attachment Orders under Bahraini law.  In the event that the Bahraini court declines to exercise jurisdiction, this Court will decide the dispute.  See Condor Ins., 621 F.3d at 329

(recognizing the bankruptcy court's authority under chapter 15 to decide an avoidance claim based on foreign law). Finally, the parties should schedule a conference to be held approximately 90 days after the date of this order to report on their progress. In the interim, the Attachment Orders will remain in effect, and the Attached Funds will continue to be held by the New York County sheriff.

So ordered.

Dated: New York, New York
      November 23, 2010

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge